UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

-v.-

JOHN BRDA and GEORGIOS PALIKARAS,

Defendants.

---

24 Civ. 4806 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

Plaintiff United States Securities and Exchange Commission (the "SEC")

brings this action against Defendants John Brda ("Brda") and Georgios

Palikaras ("Palikaras," and together, "Defendants"), alleging that Defendants

schemed to manipulate the stock price of Torchlight Energy Resources, Inc.

("Torchlight") in order to sell Torchlight's stock at an inflated price ahead of

Torchlight's merger with Metamaterial, Inc. ("Meta I").  Defendants now move to

transfer this case to the United States District Court for the Eastern District of

Texas, the district within which Torchlight's principal place of business was

located.  For the reasons set forth in the remainder of this Opinion, the Court

grants the motion, and transfers this case to the Eastern District of Texas.

BACKGROUND[1]

A.    **Factual Background**

According to the SEC's Complaint, Defendants' scheme began in early

2020, in response to Torchlight's deteriorating financial condition.  (Compl.

---

[1]    This Opinion draws its facts from the Complaint ("Compl." (Dkt. #1)), which is the
operative pleading in this case, as well as the declarations submitted by the parties in

¶ 2).  Torchlight, a Texas corporation engaged in oil and gas exploration and production, needed to raise capital to pay its significant debts and fund the ongoing drilling expenses of its oil and gas assets.  (*Id.* ¶¶ 17, 21-22).  To address this dire situation, Defendant Brda, Torchlight's CEO from 2014 through its merger with Meta I, developed a scheme by which Torchlight would sell its shares at an inflated price.  (*Id.* ¶¶ 1, 2, 15).

Brda's multipronged plan involved a series of transactions ultimately intended to create a "short squeeze" of Torchlight's stock.  (Compl. ¶ 3).  In this setting, a short squeeze refers to the "pressure on short sellers to cover their positions as a result of share price increases or difficulty in borrowing the security that the sellers are short."  (*Id.* ¶ 24).  As alleged in the Complaint, Brda's plan required him to (i) find a merger partner who desired Torchlight's NASDAQ listing but *not* its oil and gas leases; (ii) create a merger structure that involved the issuance of a preferred stock dividend (the "Preferred Dividend"),

---

connection with the instant motion, and the exhibits attached thereto.  *See Mohsen* v. *Morgan Stanley & Co. Inc.*, No. 11 Civ. 6751 (PGG), 2013 WL 5312525, at *3 (S.D.N.Y. Sept. 23, 2013) ("In deciding a motion to transfer, a court may consider material outside of the pleadings." (collecting cases)).  Though each Defendant filed his own motion to transfer, the Court refers to the motions as a singular motion in this Opinion, given the extensive overlap in factual and legal arguments.

For ease of reference, the Court refers to Defendant Brda's opening memorandum of law in support of his motion to transfer as "Brda Br." (Dkt. #18); to Defendant Palikaras's opening memorandum of law in support of his motion to transfer as "Palikaras Br." (Dkt. #23); to the SEC's memorandum of law in opposition as "SEC Opp." (Dkt. #32); to Defendant Brda's reply memorandum as "Brda Reply" (Dkt. #34); and to Defendant Palikaras's reply memorandum as "Palikaras Reply" (Dkt. #36).

The Declaration of John Brda submitted in support of Defendants' motion is referred to as "Brda Decl. I" (Dkt. #19); the Declaration of Ty S. Martinez submitted in opposition to Defendants' motion is referred to as "Martinez Decl." (Dkt. #33), with the appended exhibits referred to as "Martinez Decl., Ex. [ ]";  and the Declaration of John Brda submitted in further support of Defendants' motion is referred to as "Brda Decl. II" (Dkt. #35).

such that the proceeds from the sale of Torchlight's oil and gas assets would be allocated to Torchlight's legacy shareholders; (iii) promote the Preferred Dividend in the hopes of spreading a narrative to investors that short sellers would not be able to obtain the Preferred Dividend, thus pressuring short sellers to close their positions and artificially raising the price of Torchlight common stock; (iv) capitalize on Torchlight's inflated common stock price by, among other things, raising capital through an at-the-market offering (the "ATM Offering"); and (v) use the capital raised in this process to drill the wells required to maintain Torchlight's oil and gas leases.  (*Id.* ¶ 25).

Brda found an eager merger partner in Palikaras, the CEO of Meta I. According to the Complaint, Brda informed Palikaras about the scheme at the outset of merger negotiations, and Palikaras embraced the plan.  (Compl. ¶ 4). Meta I was interested in obtaining Torchlight's NASDAQ listing, but had no interest in the oil and gas leases, which were not generating revenue and did not fit with Meta I's existing business model.  (*Id.* ¶ 27).  Once Palikaras agreed to participate in the scheme, Brda took a number of steps to design and implement the Preferred Dividend in a manner that would precipitate the desired short squeeze.  (*Id.* ¶ 30).  By introducing a variety of specific provisions into the terms of the Preferred Dividend, Brda intentionally created a circumstance in which short sellers would have difficulty obtaining and delivering the Preferred Dividend (along with the borrowed Torchlight stock) to lenders in the future.  (*Id.* ¶ 31).

In September 2020, Brda proposed the terms of the Preferred Dividend to Meta I and secured Meta I's initial consent. (Compl. ¶ 33). Brda subsequently negotiated and secured Meta I's consent to a definitive agreement that incorporated the Preferred Dividend, which agreement both companies announced on December 14, 2020. (*Id.*). Notably, Meta I's Board of Directors, which included Palikaras, knew the intended goal of this merger structure, with one board member noting that the Preferred Dividend would "raise enough money when the shorts get squeezed to eliminate all [Torchlight's] debt." (*Id.* ¶ 36). After securing Meta I's approval, Brda caused Torchlight to propose and solicit shareholder approval for his intended structure of the Preferred Dividend. (*Id.* ¶ 34). This included, but was not limited to, securing shareholder approval of Torchlight's definitive proxy statement, dated May 7, 2021, and subsequent preliminary proxy statements issued throughout early 2021, all of which Brda approved. (*Id.*).

Brda, through Torchlight, proceeded to make several misleading public disclosures about the Preferred Dividend. (Compl. ¶ 38). According to the Complaint, Brda failed to disclose, and thus caused Torchlight to fail to disclose, the following in public statements made in the first half of 2021: (i) the Preferred Dividend was intended to cause a short squeeze; (ii) Brda believed the Preferred Dividend would cause a short squeeze; (iii) the potential for a short squeeze was considered when Brda and Torchlight approved the merger and recommended it to Torchlight's shareholders; (iv) Brda planned to deploy the ATM Offering; and (v) in connection with merger discussions,

Torchlight and Meta I discussed the potential short squeeze.  (*Id.* ¶ 40).  These misleading statements, initially made in Torchlight's proxy statements, were then incorporated by reference into Torchlight's 2020 Form 10-K, filed on March 18, 2021, which form also contained representations that Brda knew to be false.  (*Id.* ¶¶ 43-44).  The SEC posits that Brda "knowingly or severely recklessly" made these false or misleading statements in furtherance of his scheme.  (*Id.* ¶ 46).  For Palikaras's part, the SEC alleges that he was aware of each of the false and misleading statements outlined in the Complaint and had knowledge about the undisclosed matters since at least as early as September 2020, but failed to take any action.  (*Id.* ¶¶ 47-49).

In addition to concealing their scheme from the market through misstatements and omissions, Defendants are alleged to have deceptively marketed the Preferred Dividend with the twin goals of (i) causing short sellers to panic and (ii) increasing interest and confidence among legacy and prospective Torchlight shareholders.  (Compl. ¶ 51).  Defendants' efforts included the issuance of press releases announcing the Preferred Dividend to the public on September 21, 2020, and December 14, 2020.  (*Id.* ¶¶ 5, 52, 54).  Indeed, when their initial press release in September 2020 did not cause the expected surge in Torchlight's stock price, Defendants took further action to promote the Preferred Dividend, including engaging in private communications with investors and third-party consultants, as well as issuing false or misleading statements and omissions about the Preferred Dividend in Torchlight's public filings and proxy statements.  (*Id.* ¶¶ 5-6, 55, 67).

Defendants also aggressively used social media to promote the Preferred Dividend. (*Id.* ¶¶ 62-66). For instance, on June 13, 2021, the day before Torchlight announced the Record Date of its Preferred Dividend, Palikaras tweeted a graphic of shorts-in-flames, which was one of many tweets allegedly issued to encourage investors to purchase Torchlight's common stock. (*Id.* ¶ 64).

Ultimately, Defendants successfully manipulated the price of Torchlight's stock in June 2021, in advance of the merger. (Compl. ¶¶ 7, 89). Before the merger, Torchlight's stock was trading below $1.00 per share, prompting a delisting notice from NASDAQ. (*Id.* ¶ 23). However, as a result of Defendants' scheme, and following the announcement of the Preferred Dividend's Record Date on June 14, 2021, the price of Torchlight stock surged by over 200%. (*Id.* ¶¶ 1, 95). Specifically, the stock price jumped from $3.58 on June 14, 2021, to $5.99 per share on June 16, 2021, to its peak of $10.88 per share on June 21, 2021. (*Id.* ¶ 95).

Defendants capitalized on this price increase by commencing the ATM Offering. (Compl. ¶ 98). Brda caused Torchlight, through an investment bank, to initiate the ATM Offering starting on June 18, 2021, just days after the June 14 announcement of the Record Date. (*Id.* ¶ 103). Over the five-day ATM Offering, Brda successfully profited on the short squeeze, as evidenced by Torchlight's sale of 16.2 million shares to investors at an average price of $8.50 per share, raising a total of $137.5 million. (*Id.* ¶¶ 8, 106). Torchlight's stock price proceeded to fall dramatically after the completion of the ATM Offering,

with the stock price dropping to $3.98 per share upon completion of the merger

with Meta I.  (*Id.* ¶ 107).  Following the merger, the newly formed company,

Meta Materials, Inc. ("Meta II"), paid Brda a bonus of $1.5 million.  (*Id.* ¶ 109).

Brda also held a consulting role with Meta II through late 2022.  (*Id.* ¶ 15).

Palikaras was named as President and CEO of Meta II, which roles he occupied

until his termination in October 2023.  (*Id.* ¶ 16).

## B.    Procedural Background

On June 25, 2024, the SEC commenced this action with the filing of the

Complaint, alleging Defendants' primary violations of: (i) Section 17(a) of the

Securities Act of 1933 (the "Securities Act"), (ii) Section 10(b) of the Securities

Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 thereunder, and

(iii) Section 14(a) of the Exchange Act and Rule 14a-9 thereunder, as well as

aiding and abetting Meta II's violations of (iv) Section 13(a) of the Exchange Act

and Rules 12b-20 and 13a-11 thereunder, and (v) Section 13(b)(2)(A) and

13(b)(2)(B) of the Exchange Act.  (Dkt. #1).  Defendants Brda and Palikaras

were served on June 25 and 26, 2024, respectively, and both individuals were

required to answer, move, or otherwise respond to the Complaint by August 26,

2024.  (Dkt. #10, 11).

On August 8, 2024, Defendants Brda and Palikaras filed separate

motions to transfer this case to the United States District Court for the Eastern

District of Texas.  (Dkt. #17-19, 22-23).  By stipulation and order dated

August 15, 2024, the parties agreed on a briefing schedule for the motion to

transfer.  (Dkt. #27).  Pursuant to that schedule, the SEC filed its opposition to

Defendants' motions and accompanying declaration on September 4, 2024.
(Dkt. #32-33).  Defendant Brda filed his reply and accompanying declaration on
September 10, 2024 (Dkt. #34-35), and Defendant Palikaras filed his reply on
September 11, 2024 (Dkt. #36).

## DISCUSSION

### A.    Applicable Law

As noted, Defendants seek transfer of the case to the Eastern District of
Texas.  Section 1404(a) provides that, "[f]or the convenience of parties and
witnesses, in the interest of justice, a district court may transfer any civil
action to any other district or division where it might have been brought or to
any district or division to which all parties have consented."  28 U.S.C.
§ 1404(a).  In making determinations of convenience under Section 1404(a),
district courts have "broad discretion" to consider "notions of convenience and
fairness … on a case-by-case basis."  *D.H. Blair & Co., Inc.* v. *Gottdiener*, 462
F.3d 95, 106 (2d Cir. 2006).

When deciding a motion to transfer pursuant to Section 1404(a), courts
undertake a two-step inquiry.  *See Enigma Software Grp. USA, LLC* v.
*Malwarebytes Inc.*, 260 F. Supp. 3d 401, 407 (S.D.N.Y. 2017).  *First*, courts
must determine if the action "might have been brought in the district to which
transfer is sought."  *Smart Skins LLC* v. *Microsoft Corp.*, No. 14 Civ. 10149
(CM), 2015 WL 1499843, at *4 (S.D.N.Y. Mar. 27, 2015) (internal quotation
marks and citation omitted).  A case might have been brought in another forum
"if 'at the time the suit was brought, the defendants were subject to jurisdiction

8

and venue was proper' in that district." *Id.* (quoting *Giuliani, S.p.A.* v. *Vickers, Inc.*, 997 F. Supp. 501, 502 (S.D.N.Y. 1998)).

*Second*, the court must determine "whether the convenience of the parties and witnesses and the interests of justice favor transfer." *In re Seroquel XR (Extended Release Quetiapine Fumarate) Litig.*, No. 19 Civ. 8296 (CM), 2020 WL 5587416, at *3 (S.D.N.Y. Aug. 12, 2020). Courts in this Circuit have identified the following non-exhaustive factors as relevant for conducting a transfer inquiry:

> [i] the convenience of the witnesses, [ii] the convenience of the parties, [iii] the location of relevant documents and the relative ease of access to sources of proof, [iv] the locus of operative facts, [v] the availability of process to compel the attendance of unwilling witnesses, [vi] the relative means of the parties, [vii] the forum's familiarity with governing law, [viii] the weight accorded to plaintiff's choice of forum, and [ix] trial efficiency and the interests of justice.

*Enigma Software Grp. USA, LLC*, 260 F. Supp. at 407 (quoting *Everlast World's Boxing Headquarters Corp.* v. *Ringside, Inc.*, 928 F. Supp. 2d 735, 743 (S.D.N.Y. 2013)). "There is 'no rigid formula for balancing these factors and no single one of them is determinative.'" *Power Play 1 LLC* v. *Norfolk Tide Baseball Club, LLC*, No. 17 Civ. 4831 (WHP), 2018 WL 357304, at *4 (S.D.N.Y. Jan. 9, 2018) (quoting *Citigroup Inc.* v. *City Holding Co.*, 97 F. Supp. 2d 549, 561 (S.D.N.Y. 2000)). Instead, courts are to exercise their "broad discretion" when deciding whether to transfer venue, conducting evaluations on a "case-by-case basis." *Id.* Further, when evaluating these factors, the Court "may consider factual material outside of the pleadings." *Id.*

### B.    Analysis

#### 1.    This Action Could Have Been Brought in the Eastern District of Texas

As a threshold matter, it is undisputed that this case could properly have been brought in the proposed transferee district.  (*See* Brda Br. 5 ("It is undeniable that this action could have been brought in the Eastern District of Texas."); SEC Opp. 7 n.11 ("The SEC does not dispute that this action could have been brought in the E.D. Texas, among various other venues.")).  "Under both the Exchange Act and the Securities Act, a civil suit may be brought 'in the district wherein the defendant is found or transacts business,' 15 U.S.C. §§ 77v(a), 78aa(a), and under the Exchange Act, a civil suit may also be brought in any district 'wherein any act or transaction constituting the violation occurred,' 15 U.S.C. § 78aa(a)."  *SEC* v. *Hill Int'l, Inc.*, No. 20 Civ. 447 (PAE), 2020 WL 2029591, at *3 (S.D.N.Y. Apr. 28, 2020).  Courts have interpreted the latter language in the Exchange Act to mean that the "commission of any non-trivial act in the district establishes venue for an Exchange Act claim, even if this act does not go to the core of the alleged violation."  *Id.* (quoting *Ahrens* v. *Cti Biopharma Corp.*, No. 16 Civ. 1044 (PAE), 2016 WL 2932170, at *3 (S.D.N.Y. May 19, 2016)).  Furthermore, when the "claims are asserted under both the [Securities] and [Exchange] Acts, it is sufficient if venue is established under the [Exchange] Act."  *Id.* (quoting *Dopp* v. *Am. Elec. Labs., Inc.*, 55 F.R.D. 151, 155 n.11 (S.D.N.Y. 1972)).

Here, Torchlight was a Texas corporation with its principal place of business and only corporate office in Plano, Texas, which is located within the

Eastern District of Texas. (*See* Brda Br. 2 (citing Brda Decl. I ¶ 3)). Defendant Brda has stated that "Torchlight's public filings resulted from virtual and in-person meetings held at Torchlight's headquarters in Plano, Texas." (Brda Decl. I ¶ 6). These public filings, which were allegedly an important aspect of Defendants' scheme, were thereafter disseminated from Torchlight's headquarters. (Brda Reply 5 (citing Compl. ¶¶ 6, 31, 34, 39, 43)). It is thus clear that both Defendants transacted business from the proposed transferee district during the relevant period, establishing venue. Since venue is proper, and not disputed by the parties, the Court next considers whether, for reasons of convenience and fairness, this case should be transferred to the Eastern District of Texas.

### 2.    Transfer to the Eastern District of Texas Is Appropriate

The Court considers Defendants' request in light of the multi-factor balancing test established for evaluating motions to transfer. Ultimately, it finds that, when viewed together, the relevant factors favor the transfer of this action to the Eastern District of Texas, and thus the Court exercises its discretion to order such transfer. Specifically, the Court finds that while one factor favors retention of the case in this District, four of the nine factors favor transfer, and all remaining factors are neutral.

### a.    Factor Opposing Transfer

As a starting point for its analysis, the Court notes that the SEC's choice of forum weighs against transferring this case. The SEC brought this action in this District, and "[i]t is well settled that the plaintiff's choice of forum is given

great weight." *SEC* v. *Am. Renal Assoc. Holdings*, No. 21 Civ. 10366 (JPO), 2022 WL 1166087, at *4 (S.D.N.Y. Apr. 20, 2022) (internal quotation marks omitted); *see also Berman* v. *Informix Corp.*, 30 F. Supp. 2d 653, 659 (S.D.N.Y. 1998) (noting that a plaintiff's choice of forum is "generally entitled to considerable weight and should not be disturbed unless the balance of factors is stronger in favor of the defendant"). Where, however, "the operative facts upon which the litigation is brought bear little material connection to the chosen forum ... the plaintiff's choice will command less deference." *SEC* v. *KPMG, LLP*, No. 03 Civ. 671 (DLC), 2003 WL 1842871, at *3 (S.D.N.Y. Apr. 9, 2003) (internal quotation marks and citations omitted). Thus, the Court must determine the level of deference to be accorded Plaintiff's decision to file suit in the Southern District of New York, based on the strength of the connection between the facts alleged and this chosen forum.

In this case, the SEC makes no attempt to argue that this District is the locus of operative fact. Instead, the SEC posits that there is "no central location where all or most operative facts occurred." (SEC Opp. 13). And because the "operative facts [in this case] took place across several forums" (*id.*), the SEC argues that its choice of forum is entitled to "substantial deference" (*id.* at 21 (citing *KPMG*, 2003 WL 1842871, at *3)). The SEC is wise to avoid positioning the Southern District of New York as the sole locus of operative fact, when only a tenuous connection exists between the conduct at issue in this case and this District. While the SEC makes mention of the fact that Torchlight's stock was traded on the NASDAQ exchange, which is

headquartered in New York (*see id.* at 14), this assertion does little to strengthen any supposed connection to this District, because courts routinely find that a NASDAQ listing is insufficient to avoid transfer. *See, e.g.*, *City of Pontiac Gen. Emps. Ret. Sys.* v. *Dell Inc.*, No. 14 Civ. 3644 (VSB), 2015 WL 12659925, at *6 (S.D.N.Y. Apr. 30, 2015) ("[T]he locus of operative facts is not shifted to New York merely because [defendant's] stock was traded on the NASDAQ[.]"); *SEC* v. *Kearns*, No. 09 Civ. 2296 (DLC), 2009 WL 2030235, at *3 (S.D.N.Y. July 14, 2009) ("If trading on a New York-based stock exchange were enough by itself to avoid transfer of venue to another district, it would be virtually impossible to transfer SEC enforcement actions involving publicly-traded companies to other districts.").

The same is true for the SEC's claim that Defendants' deceptive practices harmed investors in this District. (SEC Opp. 14). Such a claim, without more, is insufficient to establish this District as the locus of operative fact — especially when the deception is alleged to have targeted investors indiscriminately throughout the country. (*See* Brda Br. 8 (noting that "Torchlight's public statements indiscriminately reached investors everywhere")). Moreover, the SEC does not claim that Defendants personally engaged with, or disseminated false or misleading information to, any particular individuals in this District. *See Hill Int'l Inc.*, 2020 WL 2029591, at *4 (granting transfer even though "investors and analysts who accessed and traded in reliance on [defendant's] false … statements included investors and analysts located in the Southern District of New York"); *Kearns*, 2009 WL

13

2030235, at *3 (noting that "while presumably investors in New York bought [the relevant] stock, so too presumably did investors in many other states"); *Am. Renal Assoc. Holdings*, 2022 WL 1166087, at *3 (affording plaintiff's choice of forum limited deference when the fraudulent scheme "touched the Southern District of New York," but "the 'center of gravity' … [wa]s the location at which the accounting fraud took place"). Because Defendants' scheme only touched New York, thus establishing a minimal connection between plaintiff's chosen forum and this litigation, the Court will treat the SEC's choice of forum with limited deference. Accordingly, while this factor disfavors transfer, it is not dispositive.

### b.    Factors Favoring Transfer

By contrast, and as set forth in the remainder of this section, the Court finds that several factors favor transfer of venue, including: (i) the locus of operative facts; (ii) the convenience of witnesses; (iii) the convenience of parties; and (iv) trial efficiency and the interests of justice.

### i.    Locus of Operative Facts

The locus of operative facts is a "primary factor in determining a section 1404(a) motion to transfer." *Delacruz* v. *Giermak*, No. 21 Civ. 3877 (ALC) (OTW), 2021 WL 5871424, at *2 (S.D.N.Y. Nov. 12, 2021) (quoting *Billing* v. *Com. One, Inc.*, 186 F. Supp. 2d 375, 377 (S.D.N.Y. 2002)). Courts find that this factor "substantially favors transfer from this district when a party 'has not shown that any of the operative facts arose in the Southern District of New York.'" *Hill Int'l, Inc.*, 2020 WL 2029591, at *4 (quoting *SBAV LP* v. *Porter*

14

*Bancorp, Inc.*, No. 13 Civ. 372 (PAE), 2013 WL 3467030, at *4 (S.D.N.Y. July 10, 2013)).  To determine where the locus of operative facts occurred, a court is required to look to the location of the events from which the claim arose, and focus on the degree of the relationship between the chosen forum and the cause of action.  *Id.*

Notably, in a securities lawsuit, the "locus of operative events ... is where the alleged misrepresentations were made."  (Brda Reply 5 (quoting *City of Pontiac Gen. Emp. Ret. Sys.* v. *Stryker Corp.*, No. 10 Civ. 376 (RWS), 2010 WL 2035130, at *4 (S.D.N.Y. 2010)))  Misrepresentations and omissions "are deemed to occur in the district where the misrepresentations are issued or the truth is withheld, not where the statements are received."  (*Id.* (quoting *City of Pontiac Gen. Emp. Ret. Sys.*, 2010 WL 2035130, at *4))  For this reason, while "[t]here is no *per se* rule requiring or presumptively favoring the transfer of a securities-fraud action to the district where the issuer is headquartered ... [a]s a practical matter, such transfers are routine."  *SBAV LP*, 2013 WL 3467030, at *5 (quoting *In re Hanger Orthopedic Grp., Inc. Sec. Litig.*, 418 F. Supp. 2d 164, 168 (E.D.N.Y. 2006)).

Despite the SEC's assertions that there is no locus of operative facts in this case (*see supra* B.2.a), many of the allegations in the Complaint concern statements or omissions made in Torchlight's press releases, proxy statements, and public filings (*see, e.g.*, Compl. ¶¶ 40-46), which materials were undisputedly issued from Plano, Texas.  In fact, Torchlight's May 7, 2021 definitive proxy statement, as well as other relevant filings, explicitly noted that

they were being issued by Torchlight's Board of Directors from the company's headquarters.  (*See* Brda Reply 5 (citing Compl. ¶¶ 6, 31, 34, 39, 43)).  While Defendant Brda may have resided in St. Louis, Missouri, Brda has stated that Torchlight's filings resulted from virtual and in-person meetings at Torchlight's headquarters, and that all of Torchlight's employees were Texas residents. (Brda Decl. I ¶¶ 6-7).  Against this factual backdrop, the Court is unmoved by the SEC's current argument that Torchlight is no longer "located in Texas," because Torchlight's headquarters moved upon the consummation of the merger with Meta I.  (SEC Opp. 22).  While true, the relocation of Meta II's headquarters does not change the fact that Torchlight conducted business in Texas during the relevant timeframe.  *See Hill Int'l, Inc.*, 2020 WL 2029591, at *5 (finding that the locus of operative fact favored transfer to the district of either the company's former headquarters or current headquarters when the headquarters changed *during* the relevant period, "but not this District," when "limited events at issue occurred in New York City" and the "effects of the scheme alleged … were experienced broadly").

While the Complaint clearly alleges that Torchlight's press releases, proxy statements, and public filings were only one mechanism through which Defendants perpetrated their fraud, none of the other conduct alleged occurred in the Southern District of New York.  For instance, Defendants Brda and Palikaras supposedly took calls with investors, presumably while in St. Louis and Nova Scotia, which are, respectively, their home locations.  (*See, e.g.*, Compl. ¶ 61).  However, the Complaint is devoid of allegations that any of those

calls was made while Defendants were in New York or was made to investors based in New York.  (*See generally id.*).  And while the SEC now claims to be "aware of Torchlight investors who claim harm from the events at issue in this case and reside in and near the Southern District of New York," this general statement does not persuade the Court that Defendants specifically targeted investors in this District.  (Martinez Decl. ¶ 32).  The same is true for Defendants' social media posts, which are not alleged to have any particular relation to this District.  (Compl. ¶¶ 62-66).

Courts routinely find that the locus of operative facts weighs in favor of transfer when it is clear no operative events took place in this District, even when there may be ambiguity as to whether the proposed transferee district is the locus of operative facts.  *See, e.g.*, *Eres N.V.* v. *Citgo Asphalt Refining Co.*, 605 F. Supp. 2d 473, 483 (S.D.N.Y. 2009) (finding that the locus of operative facts "weigh[ed] in favor of a transfer because at least some of the operative events most likely [took] place in the Southern District of Texas, and there is no indication that any of the operative events took place in New York"); *Indian Harbor Ins. Co.* v. *Factory Mut. Ins. Co.*, 419 F. Supp. 2d 395, 405 (S.D.N.Y. 2005) (transferring a case even where it is "unclear whether the [transferee state] is the locus of operative facts, [because] it is clear that New York is not" and "[w]here there is no material connection between the district and the operative facts, … the interests of justice require the transfer of [the] action").

The SEC's attempt to distinguish this case from *SEC* v. *Hill International, Inc.*, 2020 WL 2029591, and *SEC* v. *Kearns*, 2009 WL 2030235, is ultimately

unavailing.  While the SEC correctly points out that those cases involved defendants who worked at company headquarters located in the transferee district (SEC Opp. 17), the Court does not find that fact, alone, to be dispositive.  As in those cases, neither Defendant in the instant action resides in this District nor is alleged to have engaged in any relevant conduct in this District.  *Compare KPMG*, 2003 WL 1842871, at *4 (refusing to transfer when "defendants critical to th[e] lawsuit are and were located in and working from New York"), *with Kearns*, 2009 WL 2030235, at *4 (granting a motion to transfer when there were "no New-York based defendants or important events described in the complaint that took place in New York"), *and Hill Int'l, Inc.*, 2020 WL 2029591, at *4 (allowing transfer when the "SEC's Complaint tellingly does not allege that either individual defendant took any action within New York City").  The location of the defendants in the transferee district was only one of several factors that the *Hill International* and *Kearns* courts considered when determining that the locus of operative facts favored transfer.  Moreover, despite the SEC's assertions, the record does in fact support a finding that both Defendants "engaged in the fraudulent scheme in Texas" (SEC Opp. 17), because key documents at the heart of the SEC's Complaint were issued from Torchlight's headquarters.  (*See, e.g.*, Compl. ¶¶ 38-45).  Accordingly, the Court finds that the locus of operative facts favors a transfer because the heart of this case deals with misrepresentations made, at least in part, from Torchlight's headquarters in the Eastern District of Texas.

### ii.    Convenience of Witnesses

"The convenience of witnesses is an important consideration — it has often been described as the single most important § 1404(a) factor."  *SBAV LP*, 2013 WL 3467030 at *7; *see also Filmline (Cross-Country) Prods., Inc.* v. *United Artists Corp.*, 865 F.2d 513, 520 (2d Cir. 1989).  "When weighing the convenience of the witnesses, courts must consider the materiality, nature, and quality of each witness, not merely the number of witnesses in each district." *Steck* v. *Santander Consumer USA Holdings Inc.*, No. 14 Civ. 6942 (JPO), 2015 WL 3767445, at *3 (S.D.N.Y. June 17, 2015) (quoting *Liberty Mut. Ins. Co.* v. *Fairbanks Co.*, 17 F. Supp. 3d 385, 396 (S.D.N.Y. 2014)).

Defendants identify a number of nonparty witnesses whose testimonies are likely to be relevant and who are based in Texas.  Perhaps most significantly, Defendants provide that Roger Wurtele, the former Chief Financial Officer of Torchlight, resides in Plano, Texas, and "may offer testimony regarding the preparation of Torchlight's financials, its public filings, and the merger with [Meta I]."  (Brda Decl. II ¶ 3).  The SEC acknowledges the materiality of Mr. Wurtele's testimony, and the transcript from Mr. Wurtele's own deposition makes clear his potential knowledge about the alleged conduct. (SEC Opp. 12; *see, e.g.*, Martinez Decl., Ex. 5 at 24:15-20 (explaining his role in Torchlight's process for drafting Form 10-Qs and 10-Ks)).  Furthermore, Gregory McCabe and Robert Lance Cook, two of Torchlight's former board members, also reside in Texas, in districts immediately adjacent to the Eastern District of Texas.  (Brda Reply 7).  Mr. McCabe, in particular, was the former

Chairman of Torchlight's Board, and appears to be a material witness in the case, so much so that he is specifically referenced in the Complaint. (*See* Palikaras Reply 2-3; Compl. ¶ 78 (explaining that Brda circulated plans to McCabe and other insiders that were "not publicly disclose[d]")).

For its part, the SEC identifies only one individual located in this District that it intends to call as a witness — a former member of Torchlight's Board of Directors. (SEC Opp. 11-12; Martinez Decl. ¶ 20). While this individual was a member of Torchlight's Audit Committee during the relevant period, the SEC does not provide a more detailed assessment of this witness's expected role in this case or the materiality of his or her testimony. Moreover, while the Court accepts the SEC's representation that there are a number of material witnesses who reside outside of either proposed forum, the locations of these individuals does not sway the Court's analysis. (*See* SEC Opp. 11 (stating that the parties will likely call witnesses from New York and Texas, but also Massachusetts, Maine, Iowa, Florida, California, Wyoming and Canada)). Courts do not afford significant weight to witnesses who reside in neither forum state, and thus will be required to travel regardless of the venue. *See Herbert Ltd. P'ship* v. *Elec. Arts Inc.*, 325 F. Supp. 2d 282, 288 (S.D.N.Y. 2004) ("The convenience of witnesses who reside in neither the current nor the transferee forum is irrelevant when considering a motion to transfer."). Thus, while the SEC identifies one potential witness in this District, in light of the material testimony expected from Defendants' proffered witnesses, the Court nevertheless holds that this factor weighs in favor of transfer.

### iii.    Convenience of the Parties

Although this factor is considered "less important than the previous two factors," the Court concludes that the convenience of the parties weighs slightly in favor of transfer.  *Am. Renal Assoc. Holdings*, 2022 WL 1166087, at *4. While Defendants live in areas distant from either forum, all SEC counsel litigating in this matter are based in Texas.  (Palikaras Reply 8).  Based on the SEC's own calculations, the SEC's Fort Worth Regional Office, the office that investigated and pursued this case, is only 45 miles from the federal courthouse in Plano, Texas.  (SEC Opp. 6; Martinez Decl., Ex. 1 at 2).  The attorneys bringing this case therefore would be able to drive from the SEC office to the prospective courthouse in less than an hour.  (*Id.*).  *See also Am. Renal. Assoc. Holdings*, 2022 WL 1166087, at *4 ("Washington-based SEC counsel brought this action against [d]efendants and will be litigating this case, *not* the New York office, so counsel for the SEC would still need to travel even if the case were to be tried in New York."); *Kearns*, 2009 WL 2030235, at *4 ("[W]hile the SEC has an office in New York, it also has one in Philadelphia, which is 2.5 miles from the proposed transferee court, and the counsel representing the SEC work from its Washington, D.C. office.").  Furthermore, the lead trial attorney for this case resides an even shorter distance from the prospective courthouse.  (SEC Opp. 6 n.10).  Thus, the SEC can expect significantly less travel should this case be transferred, than if the case were to remain in this District.

Rather than arguing that the proposed forum is inconvenient, the SEC argues that this factor favors transfer because this District is more convenient for Palikaras, and "neither venue is more convenient for Brda, the SEC, and Defendants' counsel." (SEC Opp. 10). However, because Palikaras is not located in either state, the Court will not consider whether New York or Texas would present a more convenient forum for this litigation. *See City of Pontiac Gen. Emps. Ret. Sys.*, 2015 WL 12659925, at *5 ("Because Plaintiff is located in Michigan, its convenience is not a factor in determining whether New York or Austin would be a more convenient forum for this litigation."). Moreover, when evaluating the convenience of the parties, the Court will not consider the SEC's argument that Defendant Brda has previously brought litigation in this state (Martinez Decl., Ex. 3 (Petition to Compel Disclosure brought by John Brda in New York State Supreme Court)), because "motions for transfer are determined upon notions of convenience and fairness *on a case-by-case basis*," *City of Pontiac Gen. Emps. Ret. Sys.* v. *Dell Inc.*, 2015 WL 12659925, at *5 (emphasis added) (quotation marks omitted) (refusing to consider defendant's prior course of litigation in this District when assessing the motion to transfer). Furthermore, Defendant Brda has posited that he "travel[s] to Texas for business purposes in the ordinary course." (Brda Decl. I ¶ 2). The Court finds that this factor slightly favors transfer.

### iv.    Trial Efficiency and the Interests of Justice

Finally, the Court finds that the factors of trial efficiency and the interests of justice favor transfer as well. Defendants argue that this case

22

should be transferred, in part, because "[t]his District has one of the heaviest caseloads in the country." (Brda Br. 14-15). "Courts in this District generally tread[] lightly on the issue of comparing calendar congestion across federal districts[.]" *Alpha Indus., Inc.* v. *Alpha Clothing Co. LLC*, No. 21 Civ. 87 (KPF), 2021 WL 2688722, at *8 (S.D.N.Y. June 30, 2021) (quotation marks omitted); *see also Nuss* v. *Guardian Life Ins. Co. of Am.*, No. 20 Civ. 9189 (MKV), 2021 WL 1791593, at *9 (S.D.N.Y. May 5, 2021) (declining to decide which district is "busier or more burdened"). That said, though not determinative, "docket conditions or calendar congestion of both the transferee and transferor districts is a proper factor and is accorded some weight." *Alpha Indus., Inc.*, 2021 WL 2688722, at *8 (quoting *Miller* v. *Bombardier Inc.*, No. 93 Civ. 376 (PKL), 1993 WL 378585, at *5 (S.D.N.Y. Sept. 23, 1993)). Defendants have submitted statistics demonstrating that the median time from commencement of an action to trial in the Eastern District of Texas was 21.1 months, compared to 61.5 months in this District. (Brda Br. 15). Thus, the Court finds the interest of trial efficiency slightly favors transfer, although the Court will afford these statistics limited weight. *See City of Pontiac Gen. Emps. Ret. Sys.*, 2015 WL 12659925, at *7 (finding that "although the relative degree of docket congestion in the two Districts favors transfer, it does so minimally").

The Court also notes that there is no risk of harm to the SEC presented by this transfer, given "[t]his case is in its early stages of litigation." *Am. Renal Assoc. Holdings*, 2022 WL 1166087, at *5; *see also YLD Ltd.* v. *Node Firm, LLC*, No. 15 Civ. 855 (JPO), 2016 WL 183564, at *4 (S.D.N.Y. Jan. 14, 2016) ("Given

that this case has not proceeded past a dispositive motion, there is no lost efficiency in transferring the case to a different judge.").  Furthermore, for many of the reasons discussed above, the Court finds that the interests of justice further support transfer because, "[w]here the 'natural focus' of the case is in the transferee forum, transfer to that district is consistent with the interests of justice." *Khankhanian* v. *Khanian,* No. 16 Civ. 8396 (JFK), 2017 WL 1314124, at *7 (S.D.N.Y. Apr. 6, 2017).

### c.    Neutral Factors

The Court finds that the remaining factors are neutral and, as such, do not substantially affect the transfer analysis.

### i.    Relative Means of the Parties

Defendants argue that, when considering the relative means of the parties, the Court should take into consideration "certain costs, including hotel, meal, and transportation costs, [that] are not always covered by insurance." (Brda Br. 10).  Accordingly, because Defendants would "suffer significant personal and financial hardship if they were required to litigate this case in New York," Defendants argue that this factor favors transfer.  (*Id.* at 11).  While Defendants are correct that "insurance carriers do not invariably cover all costs" (*id.* at 10 (citing *Hill Int'l*, 2020 WL 2029591, at *7)), neither Defendant in this action is based in Texas.  Accordingly, there is no reason to believe that litigating in this case in New York, rather than Texas, will pose a more significant burden to Defendants, when either forum will require airplane travel and hotel accommodations.  *See Fullwood* v. *SDH Servs. W., LLC*, No. 16

Civ. 1 (RA), 2016 WL 3951186, at *3 n.1 (S.D.N.Y. July 20, 2016) (finding that the relative means of the parties should be "entitled to little weight because it is based on the additional expense of litigating in one out-of-state forum versus another" (internal quotations and citation omitted)).  While counsel for Defendants are largely based in Texas, the Court agrees with the SEC's analysis (SEC Opp. 10), and concludes that this factor is neutral.

### ii. Location of Documents and Relative Ease of Access to Sources of Proof

The location of relevant documents and the relative ease of access to sources of proof does not materially favor or disfavor transfer.  As the SEC notes, "modern technologies such as photocopying and faxing permit any documents … to be transported to [or from] New York with presumably minimal difficulty."  (SEC Opp. 17-18 (quoting *Amorphous* v. *Flipboard, Inc.*, No. 15 Civ. 5802 (KPF), 2016 WL 1651868, at *4 (S.D.N.Y. Apr. 26, 2016)).  *See also YLD Ltd.*, 2016 WL 183564, at *2 n.1 (observing that this factor favors neither party "given the availability of electronic discovery").  And Torchlight, having merged to form Meta II, no longer maintains an office in Texas.  (SEC Opp. 18).  While Defendants have proffered that "all relevant documents are likely to be found in the Eastern District of Texas," because, in part, the SEC's investigation occurred in Texas (Brda Br. 12-13), the Court understands from the SEC's submissions that all relevant, non-privileged documents from the SEC's investigation are now "maintained on electronic systems" (Martinez Decl. ¶ 19).  As such, the Court finds that this factor is neutral.

### iii.    Availability of Process

The parties concede that the availability of process factor does not materially favor or disfavor transfer.  As both sides acknowledge, the parties can compel the attendance of witnesses in either forum "because witnesses may be subpoenaed anywhere within the United States to testify at trial pursuant to 15 U.S.C. § 78aa."  (*See* SEC Opp. 10 (citing Brda Br. 15-16); Brda Br. 16 (stating that "either party can compel witnesses to appear or produce documents in either SDNY or the Eastern District of Texas")).  *See also Am. Renal Assoc. Holdings*, 2022 WL 1166087, at *5 (finding this factor to be neutral when both parties agreed that the "parties have nationwide power to compel witness attendance").

### iv.    Familiarity with Governing Law

Finally, the parties agree that the comparative familiarity with governing law factor is neutral.  (*See* SEC Opp. 19; Brda Br. 16).  As all parties acknowledge, there is no basis to conclude that this Court or a court in the transferee district would be materially more familiar with the federal laws that govern the SEC's claims.  *See City of Pontiac Gen. Emps. Ret. Sys.*, 2015 WL 12659925, at *7 ("Because this case is governed in its entirety by federal law, familiarity with governing law neither favors nor disfavors transfer."); *Am. Renal Assoc. Holdings*, 2022 WL 1166087, at *5 (rejecting the SEC's argument that this district has an "expertise in securities law" because the transferee court "is equally familiar with the federal law governing the claims").

In sum, the relevant factors, when viewed together, weigh in favor of the transfer of this case to the Eastern District of Texas. The locus of operative facts, convenience of the witnesses, convenience to the parties, and trial efficiency and interests of justice factors all favor transfer, and outweigh the only countervailing factor, the SEC's choice of forum, which the Court views with limited deference.

## CONCLUSION

For the reasons set forth above, the Court GRANTS Defendants' motion to transfer this case to the Eastern District of Texas. The Clerk of Court is directed to terminate the pending motions at docket entries 17 and 22. The Clerk of Court is further directed to transfer this case in its entirety to the United States District Court for the Eastern District of Texas.

SO ORDERED.

Dated:    November 18, 2024
          New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge